## UNITED STATES DISTRICT COURT
## IN THE SOUTHERN DISTRICT OF TEXAS
## CORPUS CHRISTI DIVISION

| | | |
|---|---|---|
| **DORIS FORTE, ET AL.,** | § | |
| **Plaintiffs** | § | |
| | § | |
| **v.** | § | **Civil No. CC-07-155** |
| | § | |
| **WAL-MART STORES, INC.,** | § | |
| **Defendant** | § | |

### MEMORANDUM OPINION AND ORDER DENYING DEFENDANT'S RENEWED MOTION FOR JUDGMENT AS A MATTER OF LAW AND CONDITIONALLY GRANTING MOTION FOR NEW TRIAL ON PENALTIES

Plaintiffs in this case are licensed Texas optometrists who formerly leased office space from Wal-Mart Stores, Inc. ("Wal-Mart"). Each Plaintiff entered into a separate lease agreement with Wal-Mart to lease office space on the premises of various Wal-Mart stores located throughout the State of Texas. Plaintiffs claim Wal-Mart controlled or attempted to control their professional judgment and manner of practice by setting or attempting to influence their office hours, in violation of the Texas Optometry Act ("TOA"). *See* TEX. OCC. CODE §351.408(c)(1).[1] Plaintiffs seek statutory penalties, court costs, and attorneys fees, pursuant to §§351.605,[2] 351.603(b).[3]

---

[1] "A manufacturer, wholesaler, or retailer of ophthalmic goods may not directly or indirectly control or attempt to control the professional judgment, manner of practice, or practice of an optometrist." TEX. OCC. CODE §351.408(c)(1). In section 351.408, "control or attempt to control the professional judgment, manner of practice, or practice of an optometrist" includes setting or attempting to influence the professional fees or office hours of an optometrist. *Id*. at §351.408(b)(1).

[2] "A person injured as a result of a violation of Section 351.408, including an optometrist who is a lessee of a manufacturer, wholesaler, or retailer is entitled to the remedies in Sections 351.602(c)(2), 351.603(b), and 351.604(b)." TEX. OCC. CODE §351.605.

[3] "The attorney general or board may institute an action against a manufacturer, wholesaler, or retailer of opthalmic goods in a district court in the county in which a violation of Section 351.408 is alleged to have occurred for injunctive relief and a civil penalty not to exceed $1,000 for each day of a

In August, 2010, the parties tried the claims of Plaintiffs Doris Forte, John Boldan, David Wiggins, and Bridget LeeSang ("Plaintiffs") to a jury.[4]  After four days of trial, the jury entered a verdict against Wal-Mart.  Specifically, the jury found that Wal-Mart controlled or attempted to control Plaintiffs' professional judgment, manner of practice, or optometrical practice by setting or attempting to influence their office hours.  The jury also found that Wal-Mart's conduct injured Plaintiffs and awarded them an aggregate civil penalty of $3,953,000.00.[5]  *See* D.E. 276.

Pending before the Court is Wal-Mart's renewed motion for judgment as a matter of law and alternative requests for new trial or a remittitur, brought pursuant to FED. R. CIV. P. 50(b).  *See* D.E. 300.  On January 26, 2011, the Court heard the parties' oral argument on the motion.  For the reasons explained below, Wal-Mart's renewed motion for judgment as a matter of law is DENIED and motion for new trial on penalties is GRANTED, unless Plaintiffs consent to a partial reduction of their penalty awards to $ 400.00 for each day of a violation, i.e. each day Plaintiffs represented in their individual lease agreements with Wal-Mart that they would operate their practice.

## I.    Renewed Motion for Judgment as a Matter of Law

Pursuant to FED. R. CIV. P. 50(b), Wal-Mart first argues there is no legally sufficient evidentiary basis to substantiate the jury's liability finding against Wal-Mart.  Wal-Mart contends the conduct alleged by Plaintiffs does not constitute a violation of the TOA.  Specifically, Wal-Mart argues the lease agreement provision at issue, which required Plaintiffs to represent their intended

---

violation plus court costs and reasonable attorney's fees."  *Id*. at §351.603(b).

[4] The claims of Plaintiffs Sylvia Brown, Sherri Fauver Rast, Marcus Hood, Ghassen Atashi Rang, John Rivera, Bernard Maslovitz, Doan-Ahn Pham, and Ron Mixon are still pending.

[5]  The jury awarded $1,075,000.00 to Doris Forte, O.D., $1,240,000.00 to David Wiggins, O.D., $1,456,000.00 to John Boldan, O.D., and $182,000.00 to Bridget LeeSang, O.D

hours of operation within the lease agreement, was not an enforceable condition of the leases, and therefore, does not constitute an attempt by Wal-Mart to influence Plaintiffs' office hours.  Apart from the written lease agreements themselves, Wal-Mart contends there is no legally sufficient evidence that it engaged in any other conduct that violated the TOA.  Wal-Mart also argues that allowing judgment on the jury's verdict would violate Wal-Mart's state and federal due process rights because the TOA is unconstitutionally vague and did not provide fair notice to Wal-Mart that its conduct violated the TOA.  The Court disagrees.

### A.    Applicable Law

"A motion for judgment as a matter of law ... in an action tried by jury is a challenge to the legal sufficiency of the evidence supporting the jury's verdict."  *Navigant Consulting, Inc. v. Wilkinson*, 508 F.3d 277, 283 (5th Cir. 2007) (citing *Flowers v. S. Reg'l Physician Servs., Inc.*, 247 F.3d 229, 235 (5th Cir. 2001)).  In deciding such motions, the district court applies the standard established in *Boeing Co. v. Shipman*, 411 F.2d 365 (5th Cir. 1969) (*en banc*), overruled on other grounds, 107 F.3d 331, 336 (5th Cir. 1997).  *Urban* Developers *LLC v. City of Jackson, Miss.*, 468 F.3d 281, 296–97 (5th Cir. 2006) (citing *Boeing*, 411 F.2d at 374).  *Boeing* instructs the Court to consider all of the evidence in the light and with all reasonable inferences most favorable to the party opposed to the motion.  *Boeing*, 411 F.2d at 374.  If the facts and inferences point so strongly and overwhelmingly in favor of  one party that the Court believes that reasonable men could not arrive at a contrary verdict, granting the motion is proper.  *Id.*  On the other hand, if there is substantial evidence opposed to the motions, that is, evidence of such quality and weight that reasonable and fair-minding men in the exercise of impartial judgment might reach different conclusions, the motion should be denied.  *Id.*

### B.    Analysis

The TOA explicitly prohibits a retailer of ophthalmic goods, such as Wal-Mart, from directly or indirectly controlling or attempting to control the professional judgment, manner of practice, or practice of an optometrist.  TEX. OCC. CODE §351.408(c)(1).  The statute clearly defines "control or attempt to control" to include setting or attempting to influence the office hours of an optometrist.  *Id*. at §351.408(b)(1).  During the four-day trial, the jury heard the live testimony of Plaintiffs and Wal-Mart's corporate representatives and employees concerning the details surrounding the formation, renewal, and non-renewal of the various lease agreements at issue in this case.  The Court also admitted into evidence various internal corporate documents by Wal-Mart, including letters, e-mails, and memoranda, along with the written lease agreements themselves and Wal-Mart's stipulation that it required "as a condition to obtain or renew a license agreement" that Plaintiffs represent their weekly hours of coverage to patients.  *See* D.E. 301-1.

Considering all of the evidence in the light and with all reasonable inferences in favor of Plaintiffs, the Court finds there is legally sufficient evidence to substantiate the jury's verdict on liability.  The Court finds reasonable and fair-minded men could conclude from the evidence that Wal-Mart unlawfully attempted to influence Plaintiffs' office hours.  Wal-Mart's renewed motion for judgment as a matter of law is therefore DENIED.

4

## II.       Motion for New Trial or a Substantial Remittitur

In the alternative, also pursuant to Rule 50(b),[6] Wal-Mart moves for a new trial or, in the second alternative, a substantial remittitur of the penalties awarded by the jury.  Wal-Mart argues: (1) the penalties awarded are excessive under Texas law; (2) the penalties awarded "shock the conscience" and were a result of the jury's bias or prejudice; (3) the penalties awarded are so excessive that they violate federal and state due process standards; (4) the jury miscalculated the penalties; and (5) the jury was confused and misunderstood the law.  For the reasons explained below, the Court finds the penalties awarded to Plaintiffs by the jury are excessive under Texas law. The court finds all other arguments raised by Wal-Mart in support of its motion for new trial or remittitur have no merit and are OVERRULED.

### A.       Applicable Law

Rule 59 provides that, after a jury trial, a court may grant a new trial on all or some of the issues, and to any party, "for any reason for which  a new trial has heretofore been granted in an action at law in federal court ... " FED. R. CIV. P. 59(a)(1)(A).  For example, a new trial may be granted if the district court finds the damages awarded are excessive.  *Beckham v. Louisiana Dock Co., L.L.C.*, 124 Fed. Appx. 268, 270 (5th Cir. 2005) (citing *Smith v. Transworld Drilling Company*, 773 F.2d 610, 612 (5th Cir. 1985)); *Westbrook v. General Tire and Rubber Co.*, 754 F.2d 1233, 1241 (5th Cir. 1985).  Having determined that an award is excessive, the trial court may either order a new trial on damages or may give the plaintiff the option of avoiding a new trial by agreeing to a remittitur

---

[6] Rule 50(b) provides that "No later than 28 days after the entry of judgment – or if the motion addresses a jury issue not decided by a verdict, no later than 28 days after the jury was discharged – the movant may file a renewed motion for judgment as a mater of law and may include an alternative or joint request for a new trial under Rule 59." FED. R. CIV. P. 50(b).

of the excessive portion of the award.  *Hernandez v. M/V Rajaan*, 841 F.2d 582, 587 (5th Cir. 1988) (citing *Osburn v. Anchor Laboratories, Inc.*, 825 F.2d 908, 919 (5th Cir. 1987)).  *See also Gorsalitz v. Olin Mathieson Chemical Corp.*, 429 F.2d 1033, 1042-43 (5th Cir. 1970).

In an action such as this, which is based on state law but tried in federal court by reason of diversity of citizenship, a district court must apply a new trial or remittitur standard according to the state's law controlling jury awards for excessiveness or inadequacy.  *Foradori v. Harris*, 523 F.3d 477, 497 (5th Cir. 2008) (citing *Gasperini v. Center for Humanities, Inc.*, 518 U.S. 415, 116 S.Ct. 2211, 135 L.Ed.2d 659 (1996)).[7]  In Texas, the standard of review for an excessive damages complaint is factual sufficiency of the evidence.  *Maritime Overseas Corp. v. Ellis*, 971 S.W.2d 402, 406 (Tex. 1998) (citing *Rose v. Doctors Hosp.*, 801 S.W.2d 841, 847-48 (Tex. 1990)); *See also Pope v. Moore*, 711S.W.2d 622, 624 (Tex. 1986) (Factual sufficiency is the sole remittitur standard for actual damages).

In determining whether damages are excessive, trial courts and courts of appeal employ the same test as for any factual insufficiency question.  *Id.*  (citing *Flanigan v. Carswell*, 159 Tex. 598, 324 S.W.2d 835, 840 (1959)).  A court of appeals may vacate a damage award or suggest a remittitur only if the award is "so factually against the great weight and preponderance of the evidence as to be manifestly unjust." *Transp. Ins. Co. v. Meriel*, 879 S.W.2d 10, 30 (Tex. 1994) (quoting *Pope*, 711 S.W.2d at 624). When considering a factual sufficiency challenge to a jury's verdict, courts of appeals must consider and weigh all of the evidence, not just that evidence which supports the verdict. *Ellis*, 971 S.W.2d at 407 (citing *Ortiz v. Jones*, 817 S.W.2d 770, 772 (Tex. 1996); *Lofton v.*

---

[7] Under the Erie doctrine, federal courts sitting in diversity apply state substantive law and federal procedural law.  *Foradori v. Harris*, 523 F.3d 477, 497 (5th Cir. 2008) (citing *Gasperini v. Center for Humanities, Inc.*, 518 U.S. 415, 116 S.Ct. 2211, 135 L.Ed.2d 659 (1996)).

*Texas Brine Corp.*, 720 S.W.2d 804, 805 (Tex. 1986).

**B.     Analysis**

The TOA provides that a person injured as a result of a violation of section 351.408, including an optometrist who is a lessee of a retailer, is entitled to institute an action for a civil penalty not to exceed $1,000 for each day of a violation.  *See* TEX. OCC CODE §§351.605, 351.603(b).  The statute provides that each day a violation continues or occurs is a separate violation.  *Id*. at §351.552(a).  The statute also mandates that the amount of penalty shall be based on the following factors: (1) the seriousness of the violation, including the nature, circumstances, extent, and gravity of any prohibited acts, and the hazard or potential hazard created to the health, safety, or economic welfare of the public; (2) the economic harm to property or the environment caused by the violation; (3) the history of previous violations; (4) the amount necessary to deter a future violation; (5) efforts to correct the violation; and (6) any other matter that justice may require.  *Id*. at §351.552(b).

It is apparent to the Court and parties that the jury awarded Plaintiffs the maximum civil penalty available under the statute, i.e. $1,000.00 for each day Plaintiffs represented in their individual  lease agreements with Wal-Mart that they would keep their clinic open and provide coverage to patients.  The Court has reviewed and weighed the evidence and finds it is factually insufficient to support imposing the maximum civil penalty for each day of a violation.  To enter judgment on the jury's penalty awards against Wal-Mart would be manifestly unjust because, as explained below, the evidence, when properly evaluated under the statutory factors, supports imposition of a substantially smaller, but nonetheless significant, penalty.

1.    **Seriousness of the violation, including the nature, circumstances, extent, and gravity of any prohibited acts, and the hazard or potential hazard created to the health, safety, or economic welfare of the public**

The statutory purposes of the TOA, on which the Court instructed the jury, are to safeguard the visual welfare of the public and the doctor-patient relationship.[8]  *See* TEX. OCC. CODE §351.363(a).   In this case, there was no evidence that the visual welfare of the public or the Plaintiffs' professional relationships with their patients were actually compromised by Wal-Mart's conduct.  There was no evidence that Plaintiffs, as a result of Wal-Mart's conduct, were required to work to such a degree that they or their patients' health were placed in jeopardy.

The Court acknowledges the testimony of Drs. Wiggins, Boldan, and Forte concerning the potential impact that Wal-Mart's conduct could have had on their doctor-patient relationships.  All three testified that Wal-Mart's conduct, by asking them to list their intended hours of coverage in the lease agreements, had the *potential* to influence and interfere with their professional judgement and thereby affect their professional relationships with their patients.  For example, when asked by Mr. Cowles, counsel for Wal-Mart, whether Wal-Mart had ever interfered with her professional exams and treatment of patients, Dr. Forte testified as follows:

> You know, simply by virtue of the fact that Wal-Mart was persistently involved with how I managed my time in that space.  And that does affect, you know, as much as I hate to say that, it does affect my professional exam and how I managed my practice. You know, I had to do a lot of rescheduling at times to accommodate the flow of

---

[8]   The Court instructed the jury as follows: "The State of Texas has passed a statute to regulate the relationships that doctors of optometry have with their patients and others.  The stated purposes of the statute are to safeguard the visual welfare of the public and the doctor-patient relationship, assign professional responsibility, establish professional standards of professional surroundings, more nearly secure to the patient the optometrist's or therapeutic optometrist's undivided loyalty and service, and carry out the prohibitions against placing an optometric or therapeutic optometric license in the service or at the disposal of an unlicenced person.  This applies to an optometrist or therapeutic optometrists who leases space from and practices optometry or therapeutic optometry on the premises of a mercantile establishment."  *See* D.E. 272, page 7.

patients and walk-ins and I'm not saying I wasn't grateful for the business, but being adjacent to a Wal-Mart had its own built-in problems.

None of the Plaintiffs testified about a particular instance where the pressure to work influenced their professional medical judgment or where their listed hours caused harm to their patients or caused Plaintiffs to provide them substandard medical care. No patients came forward to testify or complain about the standard of care they received from Plaintiffs, and there was no expert testimony offered to explain how Wal-Mart's conduct did or could potentially cause any actual harm to the public.

### 2.      Economic harm to property or the environment caused by the violation

It is undisputed that, in their pleadings and at trial, Plaintiffs disclaimed that they have suffered any actual damages as a result of Wal-Mart's conduct. Accordingly, the Court specifically instructed the jury on that issue without Plaintiffs' objection:

> Plaintiffs do not claim they have sustained any physical or economic damages as a result of Wal-Mart's conduct. Plaintiffs only seek to recover civil penalties from Wal-Mart for each day of a violation.

> Remember, that Plaintiffs do not seek to recover any actual damages. You may not award civil penalties in order to compensate Plaintiffs for any physical or economic loss they may have sustained. *See* D.E. 272.

Plaintiffs reiterated in their live testimony that they are not seeking to recover any actual damages in this case. Dr. Boldan testified that he was not seeking any actual damages for lost profits or mental anguish. Drs. Wiggins and LeeSang likewise testified that they are not seeking to recover any actual damages they may have sustained as a result of Wal-Mart's conduct. Dr. Forte testified that she was not seeking any remedies or actual damages as a result of Wal-Mart's ultimate decision to not renew her lease agreement. In fact, when Mr. Cowles asked Dr. Forte if she was seeking a penalty against Wal-Mart for every day of the five years of leases she had with Wal-Mart, Dr. Forte

responded as follows:

> No, that's not true. That's what the statute says. That's what's allowed. What I'm seeking – what my purpose for being here is – I'm so happy to have an opportunity to speak to an unbiased group of people in a court to determine if they think that any of that is fair according to the law that Wal-Mart continues to arrogantly violate.
>
> I'm not seeking anything personally, okay? But the statute that Wal-Mart violates allows some penalty to be awarded and I'm going to let the jury decide what that is.

### 3.    History of previous violations

The evidence demonstrates that Wal-Mart has previously violated the TOA. It is undisputed that prior to 1995, Wal-Mart included a liquidated damage provision in their Texas lease form. Under that provision, if a doctor failed to provide his contractual hours of coverage, he would be required, at the discretion of his district manager, to pay "$200.00 per day as liquidated damages for such failure." Wal-Mart also required doctors to include Wal-Mart as an additional named insured in their professional liability insurance policies.

In 1995, David Spivey, O.D., requested the Texas Optometry Board to review the legality of those provisions contained within his lease agreement with Wal-Mart. In a response letter to him dated February 21, 1995, the Texas Optometry Board concluded and advised Dr. Spivey that the liquidated damages provision "appears to be in violation" of the TOA and that the insurance provision "would be in violation" of same. *See* Defendant's Exhibit 39. The Texas Optometry Board also explained that it had "shared these concerns verbally with representatives of Wal-Mart." *Id.*

In 2001, in response to a complaint made by Terry Schitoskey, O.D., about certain behavior of Wal-Mart "managers," the Texas Optometry Board advised Dr. Schitoskey that it had "instructed the Legal Department of Wal-Mart that certain activities would be considered the control of optometry and illegal under the Optometry Act." *See* Defendant's Exhibit 48. In a response letter

dated January 5, 2001, Pauline Tureman, Director of Professional Services for Wal-Mart, Optical

Division, advised Chris Kloeris, Legal Counsel for the Texas Optometry Board, the following:

> Our investigation revealed that our managers were trying to serve our customers'
> needs to the best of their abilities.  The managers did inform the doctor of requests
> made by customers for lower prices and longer hours of operation.  Wal-Mart
> absolutely agrees and understands that the ultimate decision regarding the hours and
> fees for eye examinations are made by the doctors.  To the extent that Dr. Schitoskey
> believes our managers were imposing their judgment on hours and fees over his own
> judgment, we sincerely apologize.  *See* Defendant's Exhibit 46.

Laura Meyer and Jay Udovitsch, a District Manager for Wal-Mart, testified that from 1995

to 2008, Wal-Mart used the same lease form with all Texas optometrists.  Every lease agreement

procured by Wal-Mart during that time included a provision that required doctors to represent, i.e.

list within the contract, their intended hours and days of operation.  However, according to Angela

Muldoon's testimony, neither the Texas Optometry Board nor a court has ever concluded or ruled

that the Texas lease form at issue in this case is unlawful.  In fact, in a letter dated April 7, 1995, from

the Texas Optometry Board to Hans Oosterbaan, O.D., the Board explained the following concerning

his lease with Wal-Mart:

> The lease agreement you have forwarded does not appear to be in compliance with
> Section 5.11 of the Texas Optometry Act.  Although it appears that the licensor (Wal-
> Mart) has made several changes in the agreement, of primary concern then and within
> the current document forwarded is language regarding the setting of hours of the
> practice of the optometrist, as well as the requirement of naming Wal-Mart, a retail
> optical, as an additional named insured under the optometrist's professional liability
> insurance policy.  Theses items were discussed with Wal-Mart **but the language
> currently being used has neither been approved nor disapproved by the Texas
> Optometry Board.**  *See* Defendant's Exhibit 84.

In 2001, Wal-Mart threatened to terminate its lease agreement with Larry Decker, O.D., who,

at the time, was leasing space at the Wal-Mart store in Sulphur Springs, Texas.  In a letter to him

dated September 20, 2001, Jay Udovitsch advised Dr. Decker that his lease would be terminated for

failing to comply with Section III of the lease, i.e. for failing to use his best efforts to provide his weekly hours of coverage to his patients.  *See* Plaintiffs' Exhibits 17, 18.  In her testimony, Laura Meyer admitted that such conduct was unlawful but explained that issuing the letter was a mistake, one that was ultimately corrected by Wal-Mart.[9]

In 2004, Laura Meyer requested guidance from Robert Newell, who worked in Wal-Mart's Legal Department, about an issue regarding Dr. Wiggins's office hours:

> For the hours, the contract requires 6 days coverage but the dr is now only working 2 days a week.  Again, because this is Texas, the DM [District Manager] does not know if she can push the doctor to increase coverage.  Please review the following information and let us know what our options are.  *See* Plaintiffs' Exhibit 118.

Laura Meyer testified that she knew she couldn't "push" Wiggins on coverage, but in an e-mail to her from supervisor Stephanie Spivey, Professional Services Manager, Optical Division, Meyer is instructed otherwise:

> We won't be able to get this [15 day] letter out until Monday.  We will address the rent and the hours in the letter.  If he fails to work his contracted hours or pay rent beginning with Day 16 (after the 15  Day letter has run), then we will have the ability to terminate the Lease.  *See* Plaintiffs' Exhibit 22.

Meyer admitted these discussions were improper, but explained that the 15-day letter ultimately received by Dr. Wiggins did not include his failure to provide coverage as  a reason for potential termination.

In her video deposition, Shawna Ledsome, who previously worked as a Professional Services Recruiter for Wal-Mart, testified that she recruited doctors to work for Wal-Mart and negotiated various lease agreements with them.  She testified that Chic Leehan, who was then acting as her

---

[9]  Although Dr. Decker did receive a termination letter from Wal-Mart, he and Wal-Mart ultimately resolved their differences, and Dr. Decker retained the lease. See Defendant's Exhibit 47.

Divisional Manager, specifically directed her not to renew an existing lease agreement with Dr. Applebaum because he would not agree to increase his hours of operation.[10]

### 4.    The amount necessary to deter a future violation

It is undisputed that the Texas lease form and specific lease provision about which Plaintiffs complain in this lawsuit is no longer being utilized by Wal-Mart.  Laura Meyer testified that in 2009, Wal-Mart "fixed the problem" and revised and ceased using the Texas lease form at issue in this case. On May 15, 2009, approximately two years after this lawsuit was filed, Wal-Mart sent a memo to all of its leasing Texas optometrists via e-mail, advising them that the hours and days provision would be deleted from their contracts and that Wal-Mart has not and would not enforce the doctors' representation of hours of coverage contained within the lease.  *See* Defendant's Exhibit 54.

### 5.    Efforts to correct the violation

Aside from the fact that Wal-Mart has stopped using the lease form at issue, there is additional evidence that Wal-Mart took other steps to correct its errors and prevent future ones.  Laura Meyer testified that in 1995, she and her colleagues traveled to Austin, Texas, to meet and discuss with the Texas Optometry Board some of its concerns about the Texas lease form.  Meyer testified that, as a result of that meeting, Wal-Mart made significant changes to its Texas lease form.  Specifically, before the meeting, the lease form required that an optometrist  keep his clinic open for at least 45 hours, five days per week.  It also stated that if coverage was not provided as "required" in the contract, the optometrist could be forced to pay $200.00 per day as liquidated damages for such failure.  *See* Defendant's Exhibit 38.

---

[10]  The testimony of Shawna Ledsome was admitted for the limited purpose of impeaching previous testimony of Chic Leehan.

In the revised Texas lease form, which is the same form being complained about in this case, Wal-Mart deleted the mandatory hours and days of coverage and the word "required," and replaced it with "[T]he following is the LICENSEE'S *representation* of the weekly hours of coverage to the patients." *See* Defendant's Exhibit 17. In addition, on November 1, 1995, Wal-Mart advised its leasing Texas optometrists, in writing, that it "will not enforce the license provision requiring optometrists to add Wal-Mart as an additional insured to the professional liability policy." *See* Defendant's Exhibit 64.

In addition, as noted earlier, Wal-Mart corrected its threat to terminate Dr. Decker's lease. Dr. Decker ultimately retained his lease with Wal-Mart and was never terminated for failing to provide coverage hours. *See* Defendant's Exhibit 76-A.

On January 5, 2001, Pauline Tureman, in response to a complaint made by Dr. Shitoskey, advised the Texas Optometry Board of the following:

> Please know that it was neither the intent nor the position of Wal-Mart or its managers to violate any statute or regulation of the Texas Optometry Board. To insure misappropriate behavior does not occur in our stores, **we have contacted our management team by telephone and reiterated the fact that doctors have ultimate control over their hours and fees.**

> Be assured that compliance with all laws and regulations is mandatory for our associates and violations will not be tolerated. *See* Defendant's Exhibit 46.

Angela Muldoon testified that Wal-Mart began revising the Texas lease from in 2007. She explained that Wal-Mart no longer uses the lease form being complained about in this lawsuit and that the revised lease form does not require doctors to represent their hours of coverage. In May 2007, she developed a *PowerPoint* presentation entitled "Wal-Mart Optical Division – Control of Optometrists' Office Hours in Texas." *See* Defendant's Exhibit 52. Laura Meyer testified the presentation was used to train regional and district managers in Texas about the Texas Optometry Act and its intricacies.

The presentation includes a slide that specifically defines "control or attempt to control" within the meaning of the TOA and includes the following bullet points:

- Never discuss or seek to negotiate a mandatory office hour requirement.

- Remember that although the optometrist is a business partner, his/her practice is independent.  Given the explicit Texas prohibition, Wal-Mart must not seek to control the practice of optometrist's office hours.

- Discussions regarding optometric practice hours are not prohibited – but coercion and seeking to influence or control practice hours are prohibited under the law.

- The representation of office hours is established by the optometrist, not Wal-Mart.

### 6.     Any other matter that justice may require

#### a.     Plaintiffs were complicit in procuring their lease agreements with Wal-Mart.

The evidence demonstrates Plaintiffs voluntarily entered into and repeatedly renewed their lease agreements with Wal-Mart while knowing that the lease provision about which they complain was included therein.[11]

Dr. Wiggins leased space from Wal-Mart for a period of eight years.  During that time, Dr. Wiggins testified that he voluntarily entered into 10 separate lease agreements, including renewals, with Wal-Mart.  He testified that each time he renewed a lease he used his professional judgment when listing his intended hours of operation.  Despite his testimony that those hours were suggested

---

[11] Wal-Mart argues Plaintiffs' conduct , by allowing Wal-Mart to allegedly set their hours, violated the TOA, and that a penalty may be imposed for such conduct.  TEX. OCC. CODE 351.552(c) provides that "[T]he [Texas Optometry] board by rule shall develop and publish a standardized penalty schedule based on the criteria listed in Subsection (b)."  The Texas Administrative Code provides a guideline penalty amount for "directing or allowing optical employees or owners to set the practice hours for a leasing licensee as prohibited by §351.408 of the Act."  22 TEX. ADMIN. CODE 277.6(a)(10)(C).

to him and influenced by Wal-Mart, Dr. Wiggins also testified that he believed those hours were "workable," and in his professional judgment, appropriate under the circumstances.  Dr. Wiggins repeatedly testified that his only complaint with having to list his intended hours of operation was the fact that they were included in the body of the lease agreements or attached to it, i.e. within the confines of a legal document.  He also testified that, although he knew the inclusion of such a provision within the lease agreements violated Texas law, he entered into them anyway because he needed the work.

Dr. Boldan leased space from the Wal-Mart store in Sulphur Springs, Texas, from 2003 to 2009.  Dr. Boldan also testified that, although he knew Wal-Mart's conduct[12] was illegal, he nevertheless chose to enter into a lease agreement with Wal-Mart because "...I needed a place to continue the continuity of care for my patients since I had worked there since '98 and I needed to make a living and pay my bills and be there to provide service to my patients."

Dr. LeeSang testified that based on a newsletter she received from the Texas Board of Optometry, she too believed the hours and days lease provision contained in her lease agreement with Wal-Mart was unlawful.  Nevertheless, she repeatedly renewed her lease agreements with Wal-Mart for a period of nine years and testified that she never had a problem working six days a week.

---

[12] From 1998 to 2003, Dr. Boldan worked as an independent contractor for Dr. Decker, who, at the time, had a lease agreement with Wal-Mart for the store in Sulphur Springs, Texas.  Dr. Boldan testified that Jay Udovitsch, Optical District Manager for Wal-Mart, threatened to terminate Dr. Decker's lease for not providing his weekly hours of coverage to his patients.  The Court admitted into evidence is an e-mail from Judith Simpson, the Vision Center Manager at the Suplhur Springs office, to Jay Udovitsch concerning "Documentation on Doctor's Hours." *See* Plaintiff's Exhibit 16.  According to Dr. Boldan's testimony, Dr. Decker forwarded the e-mail to Dr. Boldan with the following comment:

"Fyi, 'someone is watching you,' 'although, they are not your employer & they are not your business partner.'"

16

### b.   Plaintiffs could have terminated their leases.

In each of their lease agreements with Wal-Mart, Plaintiffs had the exclusive right to terminate their lease agreements upon giving Wal-Mart sixty days notice in advance of termination.  Laura Meyer confirmed in her testimony that a doctor may terminate a lease at any time, for any reason, so long as they give 60 days notice.

### c.   The penalties awarded by the jury are grossly disproportionate to the injuries sustained by Plaintiffs.

As noted above, Plaintiffs specifically disclaim that they suffered or sustained any actual damages as a result of Wal-Mart's conduct.  Their primary complaint is that they had to write their intended hours of operation in the contract.  When asked to describe how he was injured as a result of having to include his intended hours of operation in the lease, Dr. Wiggins testified "...the injury is the fact that they have exerted these pressures on me to try to influence my practice, try to tell me what to do as a professional."  He explained that it "became a mechanism for them to have ability to exert pressure, influence upon me, and *potentially* my professional relationships with my patients, and even long-term *perhaps*, my professional judgment."

When asked by Mr. Burgess, counsel for Plaintiffs,  how the lease provisions affected him, Dr. Boldan testified that based on his experience with Dr. Decker, he [Dr. Boldan] "felt threatened that if I didn't work those hours that I could be terminated from my lease."  He further explained that the lease provisions affected him "extremely" every day he had the lease because it was his livelihood and "because it was a binding agreement that Wal-Mart made me enter."  At the same time, Dr. Boldan testified that he was not seeking any actual damages for lost profits or mental anguish.  He also testified that the hours listed in his lease agreement were "agreeable to work" and that, for the most part, he was already working those hours before he entered into the lease.  He repeatedly stated that

he loved to work, was a hard worker, and had no problem working the hours listed in his lease.

Dr. Forte testified that when she entered into her first the lease agreement with Wal-Mart in 2001, she and Wal-Mart mutually agreed to the hours that she would be open.  She explained that she had no problem telling Wal-Mart what her hours would be or working those same hours. She had a desire to work hard, so the hours were not a problem.  Dr. Forte's "problem" arose when the lease came up for renewal.  According to Dr. Forte's testimony, Wal-Mart began demanding coverage on Sundays.  Despite her complaints, Dr. Forte chose to renew her lease multiple times.   Dr. Forte testified that she was injured by Wal-Mart's conduct in the following manner:

> In order to do what I'm trained to do...we need a ceratin amount of freedom because of the nature of our practices, freedom to take care of our patients, and to think, and to perform certain activities.  And I feel that I've been injured because in the lease with Wal-Mart, they attempted to control the amount of time I was there, and the days and hours. And that's basically how I feel that I've been injured.

Although Dr. Forte testified that the lease limited her ability to spend more time networking and marketing her business, she also testified that she was not seeking any remedies or actual damages as a result of Wal-Mart not renewing her lease agreement.  When asked by Mr. Cowles why Dr. Forte didn't leave, in lieu of Wal-Mart's alleged interference with her practice, Dr. Forte testified as follows:

> Because I wanted to be there.  I had a business plan for my life that included putting two kids through college, paying mortgages, paying car not and all of that.  I enjoyed having a place to see my patients.  I was building a practice.  I was happy to do that.

Dr. LeeSang testified that she felt the threat of lease termination every day of the lease, and that her right to practice optometry independently was injured.

Despite these injuries, Plaintiffs also testified that they received many benefits form their lease agreements with Wal-Mart. For example, Wal-Mart provided Plaintiffs with a clinic, certain professional equipment, a steady source of patients, and an opportunity to build their professional

18

practices.  Drs. Boldan, Forte, and LeeSang testified their gross annual income, in some years, was approximately $200,000.00.  Dr. Forte testified, "I would say that I probably grossed more at Wal-Mart than I did when I was at the other places."  In addition, Priti Patel, Director of Professional Relations and Development for Wal-Mart, testified to the advantages an optometrist may have by affiliating himself or herself with Wal-Mart:

> I think some of the advantage is it's very risk free.  So, the doctor comes in, and basically they just pay rent for the space; they have traffic.  If patients and customers choose to see the doctor, the traffic is there already built in.  They've got the facilities, the utilities; it's very low risk and very low overhead.

### d. Wal-Mart never terminated or threatened to terminate a lease agreement with Plaintiffs for failing to comply with their represented hours of coverage listed in the lease.  In each instance, after Plaintiffs' respective lease terms lapsed, Wal-Mart chose not to renew.

Dr. Wiggins testified that Wal-Mart never terminated or threatened to terminate any of his lease agreements because he did not work or keep his office open on the hours he listed in the lease agreements.  Dr. Boldan also testified that, apart from the lease language itself, Wal-Mart never terminated or threatened to terminate his leases for not keeping his hours of coverage.  Dr. LeeSang testified that Wal-Mart never, verbally or in writing, threatened to terminate her lease if she didn't work her represented hours of coverage.

Although Dr. Forte testified that Wal-Mart never chastised her or threatened to terminate her for not working her represented coverage hours, she did have "disturbing conversations" with Wal-Mart and received a lot of "flack" when she was out for extended periods of time for hip replacement surgeries.  During that time, she felt very threatened because she needed to have that office to return to when she was done recovering.  Nevertheless, Dr. Forte reiterated in her testimony that Wal-Mart never told her that in order to get or renew a lease, she had to work a certain number of hours.  She

also said that Wal-Mart's ultimate decision not to renew her lease was not related to her compliance or noncompliance with coverage.

> ### e.    Plaintiffs contractually agreed to comply with the law governing their profession.

In each of their lease agreements with Wal-Mart, Plaintiffs agreed "to comply with all laws, orders, ordinances and government rules and regulations as they apply to the operation of LICENCEE'S [Plaintiffs] business, including but not restricted to all regulations pertaining to safety, health and consumer rights and all professional ethics of the optometry profession."

In April 2003, the Texas Optometry Board sent a letter to Robert Newell in Wal-Mart's Legal Department, reiterating that retailers may not make *any effort* to influence an optometrist's professional fees or hours. The Texas Optometry Board also advised that it would notify leasing doctors of same and that "to allow such control by a retailer may subject the doctor to disciplinary action." *See* Plaintiffs' Exhibit 85. In addition, Laura Meyer testified that she believes the law prohibits optometrists from voluntarily entering into a contract that would give a retailer, such as Wal-Mart, control over their hours.

> ### f.    Corporate Intent and Knowledge

There is some evidence that Wal-Mart intended to and had motive to influence Texas optometrists' hours of operation. As previously noted, prior to 1995, Wal-Mart utilized a Texas lease form that explicitly required doctors to work 45 hours per day, five days a week. It also included a liquidated damage provision, which provided the following:

> If coverage is not provided as required herein, LICENSEE shall at the discretion of LICENSOR'S District Manger, pay LICENSOR the amount of $200 per day as liquidated damages for such failure. *See* Defendant's Exhibit 38.

Laura Meyer testified that in 1997, two years after meeting with the Texas Optometry Board,

Wal-Mart's home office created the "District Mangers Optometrist Interview Guide."  *See* Plaintiffs'

Exhibit 68.  The interview guide includes "Expectations of Coverage," which explains the purpose

of the $200  penalty fee:

> Coverage is explicitly defined as the number of hours the Optometrist is on the premises and is available to conduct eye examinations.  Wal-Mart's minimum expectation of coverage is 6 days 48 hours a week to include 2 evenings until 8 p.m.

> The penalty fee of the LA [license agreement] is designed to ensure or enforce the importance of the Optometrists fulfilling his/her commitment of coverage as stated in the LA.

Although the mandatory hours and penalty provisions were eventually deleted from the Texas

lease form, the revised form, which is at issue in this case, still required optometrists to make a

representation, i.e. list, within the lease agreement, their intended hours of operation.  It also included

a default provision, which allowed Wal-Mart to terminate the lease if the optometrists "failed to abide

by any of the terms and conditions herein contained..."  In addition, Wal-Mart's basic training program

for district managers in the optical division instructs district managers that "[T]he contract is not just

a piece of paper; it is a Legally Binding Contract."  *See* Plaintiffs' Exhibit 23.

In a corporate document entitled "Doctor Project," Wal-Mart defines the project's scope to be:

> "[D]etermine what hours the Doctors should be working in order to provide the services to our customers/patients when they need it.  This analysis should include...[D]etermine what correlations exist between store sales volume and doctor coverage."  *See* Plaintiff's Exhibit 5.

Laura Meyer testified that she determined there was a significant correlation between sales and the

amount of doctor coverage, i.e. the more hours doctors work the more money Wal-Mart generally

makes.  She also acknowledged that one way to drives sales is to increase doctor coverage at stores.

In a 2002 e-mail from her to various colleagues and supervisors, Laura Meyer attached a

spreadsheet comparing average sales based on doctors' "chair time," i.e. when the doctor is open to

21

see patients.  *See* Plaintiffs' Exhibit 117. p117.  The spreadsheet shows a significant difference in the amount of sales when a doctor has more than 40 hours of chair time versus less than 40 hours of chair time.

In a 2002 e-mail from him to various regional managers, Lance De La Rosa with Wal-Mart writes the following:

> Here are the top 200 stores with a 2nd Dr. lanes in place that do not have double coverage on Saturday.  Knowing that in many cases we have maxed or exam business on Saturday this is a great tool to use to drill down and fix the coverage quickly. Please contact each store noted and secure additional coverage. We have already spent the capital to get the 2nd lane.  Please let me know how I can be of help and Let's drive sales!!  *See* Plaintiffs' Exhibit 20.

District Managers were instructed to follow certain guidelines during the renewal process. These guidelines, which were explained in a memo to Dee Dee Jandt from Lance De La Rosa, Chic Leehan, and Mark Shaffer concerning the renewal of Dr. Wiggins' lease, include the following :

> Our goal on renewals is to ensure adequate coverage to satisfy our patients needs as well as 20% growth in terms of exams.  Ultimately by having the patients drive demand for exams there will be a doctor on premises every hours the Vision Center is open.  *See* Plaintiffs' Exhibit 98.

There is conflicting evidence as to whether Wal-Mart knew that its conduct, in procuring the lease agreements, was unlawful or intended it to be so.  In each of Plaintiffs' lease agreements with Wal-Mart there is a section entitled "Relationship of Licensee," which provides that Wal-Mart "shall retain no control whatsoever over the manner of means by which the Licensee [optometrist] performs his/her work."  According to Laura Meyer's testimony, this provision has been included in every Texas lease agreements since 1995.  Also admitted into evidence was a document entitled "Guide for State Laws, Rules and Regulations," which according to Laura Meyer, was utilized by Wal-Mart.  The document instructs that Texas is not a state "where we can specify the doctors hours in writing on a

lease agreement." *See* Plaintiffs' Exhibit 86.

Likewise, the "District Mangers Optometrist Interview Guide" mentioned above specifically instructed district managers to exercise caution when discussing coverage hours:

> You should understand your state's Optometric law to know if it is permissible to address this subject. In some states it is expressly forbidden according to the Optometric law to dictate or influence the Optometrists' hours of coverage. If you are uncertain of the circumstances, please consult someone from the Professional Services department. DO NOT discuss this subject with an Optometrist until you are intimately familiar with your responsibilities on the subject. *See* Plaintiffs' Exhibit68.

In September 1997, the Texas Optometry Board issued a newsletter containing the following warning:

> The Board is continually being contacted in regard to lease agreements between the optometrist and the optician/optical company "next door." We caution you that leases which reference work hours, days, weekends, etc. as a condition of the lease is in violation of Section 5.11 of the Texas Optometry Act. *See* Plaintiffs' Exhibit 14.

Laura Meyer testified that she read the newsletter, but Wal-Mart nevertheless believed that its lease form complied with Texas law. According to Meyer, Wal-Mart did not view the doctors' representation of hours to be mandatory or a condition of the lease, and that Wal-Mart's intent was not to enforce the hours provision. She testified, "[W]e believed it was okay for the doctors to write their own hours on their contracts....but we would not dictate to the doctors what their hours would be." During her examination, the following dialogue ensued:

*Mr. Canales:* Would it be wrong for Wal-Mart to attempt to influence an optometrist, like my clients, in what they write in those contracts.

*Ms. Meyer:* It would be incorrect if we were attempting to influence.

*Mr. Canales:* And the reason it would be incorrect is because it would be an illegal attempt to control their professional judgment, correct?

*Ms. Meyer:* Our intent's not to control the doctors hours in Texas.

23

> *Mr. Canales:*   I understand that.  But if that was done, it would be an illegal attempt to control their professional judgment, correct?
>
> *Ms. Meyer:*   Yes.

In his videotaped deposition, Matt Hurlevic, Divisional Manager of Professional Services, Optical, who ran operations for Wal-Mart in Texas for a short period of time, testified that he never received any special instruction from Wal-Mart about Texas law governing optometrists.   He also explained that "...our intent is not control practice with the doctors" and that he would not terminate a doctor's lease for not working the hours listed in his or her lease.

Chic Leehan, Regional Director of Wal-Mart's Health and Wellness Group, testified about his understanding of the legal limits placed upon Wal-Mart when leasing space to optometrists in Texas:

> Generally speaking, we couldn't control their operation, their hours of practice, their fees, the manner in which they practiced.  It was strictly a license agreement/leasing relationship.

Based on his discussions with Angela Muldoon, Mr. Leehan testified that it is unlawful for Wal-Mart to try and enforce the days and hours lease provision against an optometrist because "[I]t's against the law," "We're taught to do otherwise," "[T]hey are just there as a reference," and "...all we can do is ask them if they'll complete the exhibit."  When asked whether Wal-Mart wants all the blanks filled in in the lease, Mr Leehan replied "No.  Not all of them.  Just whatever the doctor is comfortable completing.  It's their choice."

Angela Muldoon, who from 2004-2007, was Director of Legal and Government Affairs for Wal-Mart, testified that during all times relevant to this lawsuit, Wal-Mart had an Optical Compliance Department, the purpose of which was to ensure that Wal-Mart was in compliance with federal and state regulations.  She also testified about the policies and practices of Wal-Mart:

*Mr. Israeloff:*        What is Wal-Mart's policy and practice with regard to whether hours reference in a Texas lease are mandatory.

*Ms. Muldoon:*        They're not mandatory.

*Mr. Israeloff:*        What's Wal-Mart's policy and practice as to whether the hours listed in a Texas lease by an optometrist are a condition of keeping that lease in full force?  That is, you have to keep working those hours [as] a condition to keep the lease in place?

*Ms. Muldoon:*        They're not.  They're a representation of what they want to work.

*Mr. Israeloff:*        Can a doctor change the hours that they have represented in their lease even during the term of that first lease?

*Ms. Muldoon:*        Yes.

*Mr. Israeloff:*        What is Wal-Mart's policy and procedure with regard to who controls the doctors' own professional judgment in their treatment of patients?

*Ms. Muldoon:*        The doctor obviously controls their professional judgment. We believe that nationally.

*Mr. Israeloff:*        Did Wal-Mart believe that the form that you used in Texas up until the time it changed last year complied with the Texas Optometry Act?

*Ms. Muldoon:*        Yes.

*Mr. Israeloff:*        In all your dealings with the Texas Optometry Board, has the Optometry Board ever challenged Wal-Mart's use of a lease form that has doctor representation of hours?

*Ms. Muldoon:*        No, not that I'm aware of.

*Mr. Israeloff:*        If the Texas Optometry Board had questioned Wal-Mart's ability to use that kind of lease form, what would Wal-Mart have done?

*Ms. Muldoon:*        We would have changed it.

*Mr. Israeloff:*        Has there ever been a court ruling holding that Wal-Mart's lease form was improper?

| | |
|---|---|
| *Ms. Muldoon:* | No. |
| *Mr. Israeloff:* | If there had been a court ruling that Wal-Mart's lease form, the one with the doctor representations of hours, was improper, what would Wal-Mart have done? |
| *Ms. Muldoon:* | We would have changed it. |

Based on all of the foregoing, the Court finds the evidence substantiating the statutory factors does not support imposing the maximum civil penalty allowed by the TOA and is therefore excessive under Texas law. The Court must now determine the proper amount of remittitur.

### C.    Amount of Remittitur

The Fifth Circuit Court of Appeals follows the "maximum recovery" standard to determine the proper amount of remittitur. *Gorsalitz v. Olin Mathieson Chemical Corp.*, 429 F.2d 1033, 1047 (5th Cir. 1970) (citing *Glazer v. Glazer*, 278 F.Supp. 476, 478-82 (E.D. La 1968)).[13]  See also *Foradori v. Harris*, 523 F.3d 477, 505 (5th Cir. 2008).  This standard permits reduction of an excessive verdict only to the maximum amount a trier of fact could properly have awarded.  *Id*.  *See also Learmonth v. Sears, Roebuck and Co.*, 631 F.3d 724, 738 (5th Cir. 2011).

The same standard that guides a court in deciding that a verdict is so excessive as to require a new trial should guide it in determining the amount of remittitur.  *Glazer,* 278 F.Supp. at 482.  The remittitur device was adopted to correct the injustice of an excessive verdict without the necessity of a new trial.  *Id*.  Its function is to take the place of a new trial when the jury has arrived at a verdict that would allow a court to order a new trial.  *Id*.  Therefore, the same respect for the 'breadth of the jury's sphere' should be required in figuring the amount of remittitur as in determining whether a new

---

[13]  In *Gorsalitz*, the Fifth Circuit explicitly adopts Judge Rubin's rationale in *Glazer v. Glazer*, 278 F.Supp. 476, 478-82 (E.D. La 1968), concerning the standard applicable to determining the amount of remittitur.  *Gorsalitz*, 429 F.2d at 1047.

trial should be granted on the basis of an excessive verdict.  *Id.*

In proceeding to fix the remittitur, the Court will be guided by the principle that the plaintiff who has been awarded an excessive amount by one jury should have the option of taking the maximum amount that the jury could properly have awarded or of taking a new trial before another one.  *Id.*  In determining this, it appears proper first to fix the amount that the Court thinks a properly functioning jury would have awarded, and this may be merely another way of saying that the starting point is the amount of damages the Court itself thinks proper on the record.  *Id.*  After that, the maximum recovery rule requires the Court to determine the maximum amount of deviation from that verdict that could be allowed without requiring a new trial.  *Id.*

A mainstay of the excessiveness determination is comparison to awards for similar injuries.  *Learmonth*, 631 F.3d at 738 (citing *Salinas v. O'Neill*, 286 F.3d 827, 830 (5th Cir. 2002)).  *See also Dixon v. Int'l Harvester Co.*, 754 F.2d 573, 589 (5th Cir. 1985).  Under this standard, the Court compares damages awarded in factually similar cases, and in arising within the controlling jurisdiction, in order to construct an objective framework for comparison. *Douglass v. Delta Air Lines, Inc.*, 897 F.2d 1336 (5th Cir. 1990).  *See also Salinas*, 286 F.3d at 830.  In this case, the Court must therefore look to similar Texas cases or federal cases governed by Texas substantive law.  *Id.*  However, "[B]ecause the facts of each case are different, prior damages awards are not always controlling; a departure from prior awards is merited 'if unique facts are present that are not reflected within the controlling case law.'"  *Learmonth*, 631 F.3d at 738 (cting *Lebron v. United States*, 279 F.3d 321, 326 (5th Cir. 2002)).

The parties have not directed the Court's attention to any decisions they contend are most similar or comparable to this case.  In fact, in its motion, Wal-Mart states "there do not appear to be

any previous cases involving civil penalties under the Optometry Act that have resulted int publicly available decisions..." *See* D.E. 300, p. 17.   Likewise, the Court has been unable to find any controlling cases sufficiently similar to provide a reasonable comparison for the penalties awarded in this case.   Because this case presents unique facts for which there are no controlling cases in the relevant jurisdiction, as explained above, the Court, in determining the appropriate amount of remittitur, is guided by the statutory penalty factors listed in the TOA.   In addition, in closing argument to the jury, Mr. Canales, counsel for Plaintiffs, suggested that the jury impose, at a minimum, $200.00 for each day of a violation:

> I submit to you that the proper penalty amount should be no less than what Wal-Mart valued per day hour be, $200.

> Recall the evidence that Wal-Mart had a lease, had a lease that said if the doctor didn't work a day, it could enforce that lease with a $200 a day penalty.   That's what Wal-Mart valued you at. I submit to you that this penalty should be based on no less than what Wal-Mart believed it was – $200; all the way up to $1,000.   That's for you to decide.   But it should be no less than $200.

The Court agrees that the liquidated penalties provision contained within Wal-Mart's prior Texas lease forms provides a reasonable and factual basis upon which the jury could  value a penalty in this case.   As argued by Mr. Canales, the Court agrees and finds it is reasonable for the jury to conclude that Wal-Mart valued an optometrist being in his or her office each day at $200.00 and that it is reasonable for Wal-Mart to forfeit to Plaintiffs a $200.00 penalty for each day of a violation.

The Court also believes there is factually sufficient evidence to support increasing the penalty above $200.00 for each day of violation.   As discussed in detail above, there is some evidence that Wal-Mart previously violated the TOA and had the motive and intent to do so.   Under the third and sixth statutory factors, the jury is entitled to consider and weigh that evidence and place a monetary value upon it.   However, the Court is convinced the penalties awarded by the jury do not reflect that

it properly weighed the evidence under the remaining statutory factors.  The penalties awarded by the jury do not reflect the evidence of Wal-Mart's efforts to correct the violation, the amount necessary to deter a future violation, or the Plaintiffs' complicity in Wal-Mart's conduct or the benefits they received therefrom.  To impose the maximum statutory penalty in this case leaves no room for greater punishment in cases involving more egregious conduct.  As such, the Court finds that $400.00, twice the $200.00 penalty,  for each day of a violation is the maximum civil penalty the jury could properly have awarded to Plaintiffs.

## III.    Conclusion

For the foregoing reasons, Wal-Mart's renewed motion for judgment as a matter of law is DENIED and motion for new trial on penalties is GRANTED, unless Plaintiffs consent to a reduction of their penalty awards to $400.00 for each day of a violation.

Plaintiffs shall advise the Court whether or not they consent to the remittitur within ten days. If Plaintiffs consent, judgment will be entered against Wal-Mart in the amount of $400.00 for each day Plaintiffs represented in their individual lease agreements with Wal-Mart that they would operate their practice, excluding holidays, as follows:[14]

| | |
|---|---|
| Doris Forte, O.D. | $423,600.00 |
| David Wiggins, O.D. | $424,000.00 |
| John Boldan, O.D. | $492,000.00 |
| Bridget LeeSang, O.D. | $56,800.00 |

---

[14] As reflected in Wal-Mart's reply brief, the Court finds Wal-Mart's calculation of the number of days for which a penalty may be awarded to Plaintiffs is correct and bases its remittirur on same.  *See* D.E. 306, Exhibit A.

If Plaintiffs do not consent to the remittitur, a new trial on penalties alone will be granted.  The Court has already concluded there is legally sufficient evidence to substantiate and uphold the jury's liability finding against Wal-Mart.

Plaintiffs' motion for entry of judgment is DENIED as moot (D.E. 321).

ORDERED May 4, 2011.


HAYDEN HEAD
SENIOR U.S. DISTRICT JUDGE